Good morning, Your Honors. Jeffrey Dickerson on behalf of the appellant Michelle Reed, out of Reno, Nevada. This comes from the District Court in Reno. It's an excessive force case and involves my client. In November of 1999, she was responding to a request by the father of the child, whom they both had born, to retrieve the child from a domestic situation. She responded to the scene and proceeded up to where the father was, who was standing there with another officer, we believe Officer Cardella. That's not clear from the record, however. She said, I'm here to retrieve the boy. Can I have the keys? He gave her the keys and she says, can I go? She testified that there was a nod from the police officer, which is different from a shake of the head, I think, in normal parlance. So she took that as an affirmative from the officer and, obviously, by being given the keys, she had the permission of the homeowner to enter the house. She proceeded up, used the key to unlock the door and proceeded to the house to retrieve her child, who was sleeping upstairs. Once she was inside the door a few steps, she heard a bang behind her and an officer suddenly grabbed her, moved her over, sat her on the couch. Then another officer came in. They both proceeded to lift her by each arm up and then in a manner that is, from her testimony, best construed, I believe, as a leg sweep takedown, one of the officers who had her placed his foot in front of her and then moved her forward so that she went down on her face first, according to her testimony. On the right side of her face is where she landed. And she testified that she did this because the other officer had control of both hands by the time the takedown occurred. The officer who was in that position does not know what the mechanism of the fall was. He does concede there was a fall. He wasn't able to see what caused the fall. She felt a foot and that's what she tripped over. Cardella, who was the officer who we contend initiated the takedown, stated that a takedown maneuver would have been inappropriate under the circumstances that he believed they had sufficient control of her in that situation, getting her up off the couch, that such a maneuver would be unnecessary, which is critical to the Graham v. O'Connor analysis. At the heart of the Graham v. O'Connor analysis, which is pivotal to this issue because we analyze the qualified immunity constitutional violation issue through those standards, objective reasonableness under the circumstances. Let me ask a somewhat more direct question, and that is, however unfortunate what you've just described may appear now, looking backwards. At the time, the officers who acted, acted on the basis of having said stop. She didn't hear it, but that's all it said. She didn't hear it. There's no contradiction that they said it. And they perceive someone who is not stopping, who is going into a house that was a crime scene, they don't know that the child is in there or who's in there or what else is going on in the house. And she's yelling and screaming at this point. And so they react to calm things down and take her outside and put her in the car. Now, under Jackson, which is my specific question, why on that scenario did what the officers did run afoul of what appeared to be reasonably, objectively necessary? In Jackson, you have a situation, as you know, Your Honor, where the circumstances were quite different in terms of the numerosity of the people present at the scene, the volatility of the scene, the number of officers that were present at the time, the fact that they disobeyed an order to disperse, the fact that she gave flight to some extent, the fact that she placed resistance to the officers upon the attempted seizure. In those circumstances, the United Circuit found that, you know, under the second prong of the analysis, that it's not clearly established that under those circumstances you could have a constitutional violation. But what they did to her was far more severe than what happened to Reed. Sure, they used And here, the injuries were minimal, assuming that they happened the way as Reed describes them. I mean, she didn't have any cuts. She didn't have any, you know, I mean, she hurt me. I'm not saying, suggesting that, you know, she didn't feel the fall, but there was nothing to indicate that her injuries were very bad. And they sat her in the car for 20 to 40 minutes. It was not hot, maybe unpleasant, but it wasn't like it was in Jackson. That's why I'm sort of probing on Jackson. Sure, it's a little different, Your Honor. First of all, I'm not sure pepper spray was applied in Jackson. My recollection of it is that she went to the ground and was at least partly down on her knees at the time the officers came up behind her and pushed her to the ground. And then another officer got on with his knee into the middle of her back. And she had been saying, according to her, I've got a pre-existing back disability of some kind. Under those circumstances, the officers applied the cuffs. But there was no evidence in the record in that case that shows any residual injury. In this case, we put forward Dr. Pike's report. It's in the record. And her own testimony as to her treatment. This was, there was a residual injury here. There was a strain of the neck. There was ongoing migraine headaches that Dr. Pike attributed directly to this accident. So that's distinguishable. And also the handcuffs in this situation were, you know, applied in an excessive manner. Because, first of all, they weren't necessary, if you believe what the officers were saying. She wasn't kicking and flailing. She was being verbally non-respondent, if you will. She was asking questions, according to her, according to the officers. She was saying, what are you doing to me? What are you doing to me? They used the handcuffs as a tool to bring her to her feet. And then they do not remove those handcuffs once she's secured in the radio car, despite two requests from her that they're hurting. Can you please remove them? So just with what you last said, I wanted to respond to that in terms of distinguishing this case from Jackson. I think there's a distinction both in terms of the conduct of the arrestee. She wasn't arrested here. Certainly in Jackson, there was cause to arrest her. In this case, there was no arrest ongoing. There's no evidence in the record that any determination was ever made to make a formal arrest. So you've got different conduct on the part of the plaintiff in this case than you do in Jackson, less egregious. And you have more far-reaching conduct in terms of the manner in which injury was afflicted, from a standing position to face first with her hands behind her back. Very different than Jackson. And the fact that there's, according to the situation, I think there's less of a need in this case because she was not kicking, she was not flailing. If you believe the officer's side of the story, they admitted that. They admitted that she was being verbally verbal. She was being verbal. And according to her, what she was doing is saying, what are you doing? What are you doing? Why are you asking me to do this? From sitting on the couch all the way forward. So I think there's a distinction between this case and Jackson to be made on the second prong of the analysis. Going back to the first prong, the district court in this case, as this court knows, did not construe the facts in the light most favorable to the plaintiff in applying the test of the first prong of the Katz test as to whether a constitutional violation occurred. The district court said that because this Katz motion has been made after the close of discovery, the first prong will not be decided solely on the facts alleged by plaintiff. It will be decided based on FRCP 56E evidence. And then he goes into it and makes a rather conclusive determination that there was no more force used than was necessary. If you believe the plaintiff's version of the events, no force was necessary. Handcuffs. Okay, maybe handcuffs. We still contend that handcuffs were unnecessary under the circumstance. But taking it from that forward, because the officer had control of her. Officer Begbie had control of her from behind. That's his testimony. He had her. And Officer Cardella says there was no need for any application of any force. If you believe the plaintiff's story as to how this went down, it's for a fact finder to determine whether or not on the merits of the claim, not qualified immunity. I mean, there's certainly enough to go to a jury here. But on a constitutional violation, constrain the facts most favorably to the plaintiff, I think the answer is yes, we can establish a constitutional violation has occurred. Then you go to the second prong to determine whether that law was clearly established at the time. In our brief, we've gone, canvassed the case law that was in effect in November of 1999. Under Grant v. O'Connor, it has long been established since that case in 1989 and before it in Tennessee v. Garner, that necessity of force is the touchstone of the analysis. Alexander v. City and County of San Francisco in this circuit makes that clear as well. We've established that there was no need for the force, and based upon that, it's per se unreasonable, and no reasonable officer in this officer's position could have believed his conduct constitutional under those standards. Thank you, Your Honor. All right. Thank you. Mr. Riley.  I'm representing the City of Sparks, Nevada, and Officers Begbie, Sgt. Cardella, and Officer Curtis, who is referred to in the caption of the case as the unknown officer number one. I have reviewed this case, of course, on the motion for summary judgment we filed in the district court, and I heard a lot of misstatements of fact in the reply to our motion for summary judgment at the district court level. I've heard a lot of misstatements of fact this morning, and I think rather than go into all of them, I'm just going to pick up a couple of the big ones that I think you may find somewhat determinative. First, the facts of this case are that, as appellant's counsel has stated, the appellant, Michelle Reed, was called to the scene of a domestic violence situation to retrieve her child. The call was made by her husband, Jason Arnold. When she arrived on scene, there were three police cars present in the front yard. This is just a small two-story apartment with a small front yard in front of it, a little courtyard off to the side of the front door. There were three police cars present when she arrived on the scene. There were three uniformed police officers present in the front yard. It's a very small 20-foot front yard from the street to the front door. There was people standing around being interrogated by the officers. When she arrived on the scene, she knew this was a crime scene. There had been physical violence at the scene between the two parties. They were physically combated, and the police had separated them according to standard procedure and were interviewing them to try and ascertain the facts of the case and if they were going to charge anybody. The appellant went over to Officer Curtis, who was on the sidewalk, briefly discussed some questions with her husband rather than the officer. Apparently, she made a request if she could go into the house. It was along the lines of, is it okay if I go in? At that point, her husband hands her the keys to her apartment. Her boyfriend hands her the keys to go in and get their child. They look at Officer Curtis, and Curtis just goes and he just kind of looks away. At that point, Curtis testified that she just stormed off. He did not, in her own testimony, state that he did not tell her that it was okay to go in. So she's proceeding towards the front door to go get her child, and she is a very young, concerned mother. At this point, maybe getting a little irrational because of some perceived fear towards her child. She goes up to the front door, and she's going up to the front door. Sergeant Cardella, who is about eight, ten feet away from her, off to the side, and is talking with some other witnesses, yells at her. First, he states at her in not a very loud voice, apparently, who are you? Where are you going? And then she ignores him. She continues proceeding towards the front door, opens the front door, but right near the front door, he yells at her, stop, come here. She ignores him. So the police are confronted with a situation where they have an unknown, now this person was unknown to Cardella and who were near the front door. These two officers didn't know this person. She had talked out with Officer Curtis on the street, but they didn't know who she was. She didn't identify herself as requested. She didn't stop as requested. She continued proceeding into the residence of a domestic violence situation. Domestic violence situations in and of themselves are apparently dangerous for police officers. It's well established. They didn't know that Michelle Reed was the mother of the child upstairs. They didn't even know there was a child sleeping upstairs. And the child was asleep, which negates some of her perceived fear. She knew the child was asleep upstairs. Nevertheless, she's proceeding to the front door. They yell at her to stop. She ignores them. They don't know what her intentions are. They don't know if she's planning to go in and get a deadly weapon and do harm to her ex-husband or his then-girlfriend, Karen Noreen. They don't know. But they have a crime scene and they have to control it. This woman breaks through the front door, storms into the house. Cardella then proceeds after her with Bigby. She essentially pushes the door back in their face. They get into the little living room right inside the entrance, grab a hold of her, set her down, try to set her down on the couch. And now she's yelling and screaming and struggling, trying to pull away from them. The testimony is well established by the officers to this They took her off the couch because they could see this was not a good situation to control her. They took her off the couch. And as they picked her up, they each had a hold of her by one arm, Cardella on one side, Bigby on the other. And apparently, at one point she continued to struggle and they decided, somebody decided to take her down. Now, appellant's counsels characterized this as like a floor sweep. And what Sergeant Cardella testified to was that a floor sweep was not necessary in this case. He never testified that no use of force was necessary, that was not necessary. Use of force was clearly necessary to control this irrational woman. And for purposes of the summary judgment motion, we concede that somebody put their foot out in front of her and maybe pushed her over the foot, probably Bigby. We're not sure. Things happen real fast in these things. Anyway, she went down very softly, was controlled by Cardella. Her descent was controlled. She hit the floor, which was a padded carpet floor, with a very relatively light blow impact and suffered very minimal damage. Why couldn't a jury find that she arrived on the scene where three police officers were in the front yard, along with her husband or former husband or whoever he is, and the alleged victim to the domestic violence, all five of them in the front yard, right? Right. With the door locked, right? She said it was locked. Well, jury could find it was locked. It could be. No problem. And then she asks her husband, where is the child? And he says the child is upstairs and asleep. And then she gets the keys and she says to this policeman, can I go in? And he neither says yes or no. Jury could find this, I think. Then she goes up and she doesn't hear anything from these officers. Now, if she doesn't hear anything from these officers until she unlocks the door, could a jury find that she is right in her assertion that nothing was said to her? Because this is all a very confined area. And the way you describe it, these officers says, who are you? And come here, right? And stop. Stop. Now, if they said that and she testifies that she doesn't hear it, isn't a jury's choice between one liar and another liar, as opposed to just saying, well, she didn't hear it, maybe they said it and she didn't hear it. And then she unlocks the door and when she gets in, according to her, she didn't know anything was happening until the door behind her was slammed open. And she says she never resisted. Now, you may or may not believe her. Well, but a jury could. And so if a jury could believe her in the scenario that I just described, how is that either lawful or worthy of immunity? Quite simply, under Saussure, you have described matters that were formerly, under the rulings of the Ninth Circuit, were formerly jury questions. Under Saussure, the U.S. Supreme Court has indicated that the trial courts are to make these determinations themselves, if it can be done, from a viewpoint of objective reasonableness. Now, let me ask one thing first. We have stipulated for purposes of summary judgment that she did not hear the commands to come here. When she was inside, she was yelling and screaming so loud, according to her own testimony, she may not have heard the commands given there to stop, quit fighting, et cetera. From an objective standpoint, it wouldn't make a lot of difference what happened outside, because inside, she actively resisted officers who were trying to control her. And she knew that she was not supposed to be in there. A reasonable person would know you don't break into a crime scene. And that was demonstrated in the cases cited in the appendix. Well, unless you had a policeman who acted like he didn't care. I'm sorry? Unless you had a policeman who acted like he didn't care. I mean, if that's her, if you can believe her, that's the difficulty. And then the court didn't exactly go the immunity formula, did it? Yes, it did. The court found under Saussure that there was no constitutional violation. That's what it said? Applied. But the district court did not, as I read the district court's opinion, the district court, in the scenario, in the factual scenario, didn't lay out the facts as you just did here. Well. That is, he has the officers placing her on the couch after they take her down. For example. Well, I don't recall that sequence. I'm sorry. My recollection is the other way around. Not that it makes a lot of difference. The witnesses to the incident inside the building were unanimous in their statements that she was struggling. The district court found she was struggling and used that word in its opinion. We have one witness. Well, how could the district court find that she was struggling on summary judgment? Well, this was, as noted, a Rule 56 summary judgment. We had taken depositions of all of the officers. Well, you don't find facts on summary judgment. You determine whether or not there's a factual dispute. And in the context of qualified immunity, you have to take the facts and the light most favorable to the injured party, to the plaintiff. And you have to resolve all factual disputes in her favor. I think if there were any disputes to be resolved, they were resolved in her favor. There was no question she was struggling. Her statements that she was struggling or wasn't resisting are not facts. You have to look at the actual conduct of the parties. And there's a part of my brief in there that I describe this. Everybody can make conclusions. I wasn't struggling. I wasn't resisting. Well, you have to look at the actual facts of what they were doing. In this case, even the only non-party witness, Karen Noring, gave a sworn statement that's attached to the motion for summary judgment that was reviewed by the district court that says when she went in there, and she came in when they had her on the ground, and she said it was taking all three officers to try and get the handcuffs on her. Two to hold her down and one to get the handcuffs on. She didn't call it struggling. She called it fighting. She was fighting with the officers. Now, you look at the realities of the situation. You look at the actual conduct of the parties to determine whether or not somebody's resisting or struggling. The officers testified that she was pulling away from them. She was trying to avoid us getting handcuffed. She was doing various physical conduct, engaging in physical conduct that any reasonable person would find was struggling. What did she do when they seated her on the couch? The record's unclear on that. I really couldn't tell you. There's debate even whether or not she was put on the couch. And when they did, see, there's also a debate as to whether or not she was tripped. But we're conceding that she was tripped for purposes of this case because under the facts as proven to the district court by affidavit and by deposition testimony, she was struggling to the point where they had to engage in a little bit more force with the controller. You have one big officer here, Officer Bigby. He's like 6 feet 240. And Cardell is about my size. Really, unless there's any other questions. I know your time is way passed up. Yes, it is. Thank you. Thank you. Mr. Dickerson. The point is, Your Honor, you have to, each of you in reviewing this case, take a de novo look at this. And that's a standard of review. The district court, with all due respect to the district court, the learning district judge missed the boat here and rushed to judgment and did not complete a full analysis as required under saucier. This court should do that. This court should go to the second prong and conduct its analysis there if the district court did not get to that so that we have a clear record on remand as to what this court's decision is on both prongs of the analysis for a complete record in this case. And that's all we can ask. Thank you. Thank you, counsel. The matter just argued will be submitted.
judges: Leavy, Rymer, Paez